**CHURCH OF THE AMERICAN KNIGHTS OF THE KU KLUX KLAN, et al., Plaintiffs,**

v.

**Bernard KERIK, et al., Defendants.**

**No. 99 Civ. 10635(HB).**

United States District Court, S.D. New York.

Nov. 19, 2002.

---

12. *United States v. Bajakajian,* 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

Norman Siegel, Arthur N. Eisenberg, Beth Haroules, New York Civil Liberties Union Foundation, New York City, for Plaintiffs.

Rachel Bess Goldman, Michael D. Hess, Corp. Counsel of City of New York, New York City, for Defendants.

### OPINION & ORDER

BAER, District Judge.

Plaintiff Church of the American Knights of the Ku Klux Klan ("American Knights") brings this action for a declaratory judgment and a permanent injunction declaring New York Penal Law § 240.35(4), which prohibits the wearing of masks at public gatherings, unconstitutional under the First Amendment. In response, defendants Bernard Kerik, former Commissioner of the New York City Police Department, and the City of New York

contend that the Court should not grant the injunctive relief as the statute is constitutional as a legitimate exercise of state police power. This Court, sitting with Judge Hellerstein, who had been assigned a related matter dealing primarily with the logistics of the proposed event, granted plaintiff's request for a preliminary injunction on October 21, 1999. The Second Circuit stayed that aspect of the relief which had permitted the use of masks. Both sides have now moved for summary judgment on their respective claims and agree that there are no material issues of fact to prevent the Court from deciding this issue on the papers submitted. For the following reasons, plaintiff's motion for summary judgment is GRANTED and defendants' motion is DENIED.

### I. PROCEDURAL HISTORY

On September 24, 1999, the American Knights applied to the New York Police Department ("police department") for a parade permit and a sound device permit in conjunction with a planned event to be held on Saturday, October 23, 1999, on the steps of the New York County Courthouse at 60 Centre Street. After reviewing the application, however, the police department informed the American Knights on October 15, 1999, that its plan to wear masks, which it had communicated to the police department, would violate New York Penal Law § 240.35(4). The permit was therefore denied. In pertinent part, N.Y. Penal Law § 240.35(4) provides:

A person is guilty of loitering when he:

... Being masked or in any manner disguised by unusual or unnatural attire or facial alteration, loiters, remains or congregates in a public place with other persons so masked or disguised, or knowingly permits or aids persons so masked or disguised to congregate in a

public place; except that such conduct is not unlawful when it occurs in connection with a masquerade party or like entertainment . . .

As a result of the denial, the American Knights, on October 19, sought a preliminary injunction forcing the police department to allow the event and the masks. On October 21, after a hearing, which included testimony from both sides, this Court sitting with Judge Hellerstein, issued a preliminary injunction that allowed the American Knights to conduct the event with masks. However, on October 22, the Circuit stayed without comment that "part of the district court order permitting the use of masks." The plaintiff applied pursuant to 28 U.S.C. § 1651 to Justice Ginsberg to re-instate the preliminary injunction, but on October 23 she declined to do so.

The American Knights conducted the event on October 23 as planned. Seventeen members participated and wore the American Knights' regalia but did not wear masks. After the event, both parties moved for summary judgment[1] on the plaintiff's request for declaratory relief and a permanent injunction. The members of the American Knights plan to hold rallies in New York in the future and seek to wear its full regalia. See Plt. Mem. at 6.

## II. BACKGROUND

The American Knights describes itself as an ideological organization that advocates white separatism and "white pride." The organization was founded by Jeffrey Berry ("Berry"), the National Imperial Wizard, approximately five years ago and claims to be an "unincorporated political membership association that advocates on behalf of the white race and the Christian faith." While not formally associated with the notorious Ku Klux Klan ("KKK"), the two groups share certain beliefs, including a belief in the separation of races. Among other things, the American Knights oppose affirmative action, racial intermarriage and immigration. The group's leaders opine that the organization does not advocate the use of force or violence to achieve its goals nor does it advocate the hatred of any racial group.

Regardless of what they may say the fact is that members of the American Knights don robes and hooded masks similar to, and traditionally associated, with the KKK, and consider these trappings integral to their identity. As one member stated,

> Our traditional Klan regalia demonstrates our organization's traditional historical link with the original Ku Klux Klan. The hooded masks also convey a sense that everyone is equal, regardless of social rank, economic status, gender or race. The robes and hood with the mask is [sic] also intended as a religious symbol. Specifically, the hood reflects their belief that they are all sinners in the eyes of God and must therefore hide ourselves before God.

Clearly, racial hatred is the image conjured up by the regalia. The American Knights, however, claim that the masks provide anonymity at public events, leafleting and at other public activities. The organization believes that due to the unpopularity of its views, "being able to preserve the anonymity of our members is important if the organization is to attract and keep members." Berry Aff. at 2. It is for this reason too that the group does not

---

1. Plaintiffs amended their complaint on January 13, 2000, to seek prospective declaratory and injunctive relief.

publicize the names of its members, except for those persons in leadership positions. In fact, the organization's concerns appear to be well-founded as members of the American Knights claim that they have been subject to public harassment, threats, and violence.

Individual members have submitted affidavits to the Court attesting to how they suffered repercussions during and after their participation in various American Knights' rallies. Specifically, members have been followed after rallies by counter-demonstrators who have attempted to ascertain the members' identities and have subjected them to verbal abuse and even physical injury. Berry stated that a number of the members, including his former wife and his son, had been injured by the conduct of counter-demonstrators either during or immediately after participation in an event.[2] The fear of identification is further illustrated by a testimonial from one of the unnamed plaintiffs in this action who described how, at an event in Ohio in 1998, her mask became separated from her hood, revealing her face. The media photographed her and the photos were widely disseminated. As a result of the publicity, her co-workers and employer learned of her affiliation with the American Knights, and she consequently lost her job. She endured threatening phone calls and hate letters, the windows in her home were broken, her car was vandalized and her children harassed. The same member reports that after her participation in the October 23 event, her children were further taunted and harassed, (she asserts that she took part in the October 23 event

only as a matter of principle to challenge the anti-mask law). Because of this negative exposure, she continues to fear retaliation.

Other members also experienced harassment and repercussions after the October 23 event. A number of the counter-demonstrators attending the event threw batteries, rocks and other projectiles at the participants and verbally threatened the members with death or injury. Two counter-protestors evaded the alleged "tight" police security and physically assaulted the Grand Dragon for the Realm of New York and New Jersey. They shattered his eyeglasses causing him serious injury. Moreover, participation in the event and ipso facto identification resulted in one person losing her job, another being harassed extensively at his job site, and the family of another member being verbally and physically abused. Some of the participants indicated that, as a result of such reprisals, they will not rally again unless they are permitted to wear masks. Still others, as a consequence of the stay, decided not to participate at all.

Further, the American Knights is systematically monitored by Klanwatch, a project of the Southern Poverty Law Center; the Anti–Defamation League; the Jewish Defense Organization; and the Right–Wing Watch project of People for the American Way. While this monitoring takes many forms, identification is pivotal. For example, as a part of the Jewish Defense Organization's "Operation Klan Kicker," the Grand Dragon for the Realm of New York and New Jersey's name,

---

2. At the hearing before this Court on October 21, 1999, Berry testified to the retaliation that his family had experienced as a result of his public exposure as the leader of the American Knights:

I've had my house bombed about 14 times ... I've had my house burnt down with a Molotov cocktail. My daughter has been shot at. I have been beaten. My family is constantly harassed, threatening phone calls over the phone, you know, saying they're going to kill us because we are members of the Ku Klux Klan.

10/21/01 Trans. at 43.

address and phone number were listed on its website for several weeks after the October 23 event. Visitors to the Jewish Defense Organization's website were encouraged to "drive [him] out of the state." Suffice it to say that membership alone in the American Knights spawns retaliation and stifles free expression. It is against this backdrop that I consider the American Knights' request for a permanent injunction.

## III. DISCUSSION

Plaintiff contends that N.Y. Penal Law § 240.35(4) constitutes an unconstitutional infringement on its members' right to free speech on several related grounds including: 1) that the statute violates their right to anonymous speech and association; 2) that the statute violates the right to symbolic speech; 3) that the statute is facially unconstitutional as it excepts conduct occurring in "connection with a masquerade party or like entertainment;" and 4) that the city has engaged in viewpoint discrimination by selectively enforcing the statute. I will discuss each argument in turn.

### I. Standard of Review

█ The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the moving party must show actual success on the merits. *See Amoco Production Co. v. Village of Gambell, AK.,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Therefore, on summary judgment, the standard is the same as for any summary judgment motion, namely the court may not grant a permanent injunction unless it determines that there is no genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Furthermore, the court must "draw all factual inferences in favor of the party against whom summary judgment is sought." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995).

### II. Wearing Masks is Protected by the Right to Anonymous Speech

Plaintiff asserts that § 240.35(4) violates its right to anonymous speech under the First Amendment by preventing its members from concealing their identities while engaged in a political demonstration.

█ No one disputes the fact that plaintiff is a notorious racist organization, at least not this Court. The focus here, however, is on the constitutional protections, spelled out in the Federalist papers by our founding fathers, and on whether the conduct here and of concerns to the police should be protected. This is not to say that there are no situations when the security of the community prevails over the right to protest. Historically, the right to free speech has been zealously guarded in America, and we need only look to the great jurists of the twentieth century to understand the depth of that guardianship and how zealously it must be protected in a democracy. "The mutual confidence on which all else depends can be maintained only by an open mind and a brave reliance upon free discussion." Learned Hand, *The Spirit of Liberty: Papers and Addresses of Learned Hand* 284 (Irving Dillard ed., 3d ed.1960). In our democracy, it has always been that "uninhibited, robust and wide open" debate has long been recognized as the lifeblood of our political system and our society as a whole. *New*

*York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Further, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

The Supreme Court has long recognized the right to express one's views anonymously.

> Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and in general, our society accords greater weight to the value of free speech than to the dangers of its misuse.

*McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (citations omitted); *see also Talley v. California,* 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) ("Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all."); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

In *NAACP v. Alabama,* 357 U.S. at 466, 78 S.Ct. 1163, the Supreme Court held that the state of Alabama could not compel the NAACP to reveal to the State's Attorney General lists of its members' names and addresses when to do so would risk impeding the growth of that organization. There, the NAACP argued that it should not be required to comply with the state law because "the effect of compelled disclosure of the membership lists [would] be to abridge the rights of its rank-and-file members to engage in lawful association in support of their common beliefs." *Id.* at 460, 78 S.Ct. 1163. In response, the government contended that the application of the law was constitutional both because the state had a legitimate interest in using the lists to determine whether the NAACP was conducting intrastate business in violation of the Alabama foreign corporations act and because any effect on the NAACP's membership was indirect. The Court applied a high level of scrutiny, stating that "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 460–61, 78 S.Ct. 1163.[3] Under this standard, the Court rejected both of defendant's arguments. First, the Court held that the fact that the statute's impact was indirect did not remove it from constitutional scrutiny.

---

**3.** Although it is difficult to generalize about the levels of scrutiny applied by the Court, the following basic guideline may be helpful. In the context of First Amendment challenges, the lowest level of scrutiny, rational basis, which asks whether the law in question serves a legitimate government interest that is rationally related to the stated purpose, is not appropriate. Rather, courts apply either an intermediate level of scrutiny, such as in the case of commercial speech, which asks whether the government has a substantial interest that is directly advanced by the law. *See Florida Bar v. Went For It,* 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). Or, more often, as in the case of political speech and artistic expression, courts apply what is called strict or exacting scrutiny, the highest level of scrutiny. Under this standard, the court must ask whether the government has a compelling interest in the law that is narrowly tailored to fit its purpose. *See NAACP,* 357 U.S. at 460, 78 S.Ct. 1163.

The fact that Alabama ... has taken no direct action to restrict the right of petitioner's members to associate freely, does not end inquiry into the effect of the production order. In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action.

*Id.* at 461, 78 S.Ct. 1163. Second, the Court observed that to reveal the identities of NAACP members would expose them to the risk of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," *id.* at 462, 78 S.Ct. 1163, and concluded that the law affected "adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining ..." *Id.* at 462–63, 78 S.Ct. 1163. The Court held that the state had "fallen short of showing a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have." *Id.* at 466, 78 S.Ct. 1163.

In a similar case, *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court held that a federal regulation that required the disclosure of donors to political parties was unconstitutional in certain instances. In *Buckley,* the plaintiffs argued that compelling certain controversial political parties to make public the names of their donors would result in a decrease in contributions as the individual donors, once identified, risked reprisal for their contributions. Affirming the right to anonymous expression, the Court stated that "we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64, 96 S.Ct. 612. The Court then applied "exacting scrutiny," and concluded that the plaintiffs had shown "a reasonable probability that [in some cases] the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74, 96 S.Ct. 612. Based on this finding, the Court agreed that the plaintiffs' interest in protecting the anonymity of their donors outweighed the government's legitimate interest in monitoring election activities.

Finally, in *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court held that an Ohio statute that prohibited the distribution of anonymous campaign literature was unconstitutional. In *McIntyre,* a citizen was fined by the Ohio Elections Commission for distributing leaflets to persons attending a public meeting in Westerville, Ohio, with respect to an imminent referendum on a proposed school tax levy. The citizen challenged the fine on the ground that it constituted an unconstitutional infringement on her right to free speech, but the state argued that the statute constituted a reasonable regulation of the electoral process. As the statute at issue burdened "core political speech," the Court applied "exacting scrutiny" under which the statute would be upheld only if it were found to be narrowly tailored to serve an overriding state interest. *Id.* at 348, 115 S.Ct. 1511. In its analysis, the Court first noted that the plaintiff's desire for anonymity may have been motivated by any number of legitimate concerns including "fear of economic or official retaliation, ... concern about social ostracism, or merely ... a desire to preserve as much of one's privacy as possible." *Id.* at 341–42, 115 S.Ct. 1511. The Court then acknowl-

edged that the state had a legitimate interest in insuring the reliability of its election information but concluded that in this case, this interest did not outweigh the plaintiff's interest in expressing her political views, particularly since the state's concern could have been addressed by a more narrowly tailored law. *Id.* at 348–49, 115 S.Ct. 1511.

Here, the concerns of the American Knights are on point with those confronted by the plaintiffs in the above cases. Like the NAACP members, the citizen distributing leaflets and the donors to political campaigns, the American Knights have produced unrefuted evidence that it has a legitimate fear of reprisal if its members reveal their identities at public American Knights' events. Members who have taken part in demonstrations without their masks, including those at the October 23 rally, describe the reprisals as pervasive and as having serious consequences in their lives including loss of employment, physical injury and threats to their children's safety. These concerns are only bolstered by the fact that a number of anti-Klan groups make it their business to monitor the activities of the American Knights, which includes various efforts to identify its members and force them out of their jobs and their communities. Furthermore, the proliferation of computers and the world wide web provides the opportunity to post photographs of and personal information about participants and to do it instantaneously at zero or little cost.

 The question then is do the facts and the law provide First Amendment protection for the plaintiff. Defendants argue that they do not. In all the cases cited, the defendants contend, there were attempts to compel disclosure—the members' names, the list of donors or the identity of the leaflet publisher—while here, the government seeks merely to prevent a demonstrator from concealing his or her identity. The distinction is misplaced. Protection does not hinge on whether the requirement "compels disclosure" or "prevents concealment," rather it is whether disclosing the identity of the American Knights' members restricts protected speech, and, if so, whether the statute is narrowly tailored to serve a compelling state interest.

When then is the test met and a statute "narrowly tailored to serve an overriding state interest"? *McIntyre*, 514 U.S. at 348, 115 S.Ct. 1511 ("When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."). The gravamen of the First Amendment protects speech we embrace as well as speech we abhor, a principle that requires constant vigilance by each branch of government. In the words of Justice Holmes, written in dissent in *United States v. Schwimmer*, 279 U.S. 644, 654–55, 49 S.Ct. 448, 73 L.Ed. 889 (1929): "If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought we hate." [4] Indeed, "[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." *Home Bldg. & Assoc. v. Blaisdell*, 290 U.S. 398, 483, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

In defense of the statute, defendants rely on security and law enforcement con-

---

**4.** The dissent by Justice Holmes became the law when *Schwimmer* was overruled by *Girouard v. United States,* 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946). *See Parker v. Levy,* 417 U.S. 733, 772 n. 6, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

cerns. The statute prevents groups of demonstrators from concealing their faces which understandably makes it more difficult for police officers to identify and apprehend wrongdoers. While these concerns were not a factor on October 23 (as no one has alleged that the American Knights' members engaged in any illegal conduct), one could argue that a police officer's job is made easier if he or she is able to see the face of the person who commits an illegal act, particularly if that person attempts to evade arrest. It is also true that if counter demonstrators cause security concerns or are believed likely to do so this too must be balanced as in so many aspects of the law against the right to protected speech. Let's look at the relevant considerations. First, is the statute narrowly tailored?[5] The statute paints with a broad brush, prohibiting all demonstrators, peaceful and unlawful alike. No evidence was submitted supporting the argument that the police department had any reason to believe that the members of the American Knights

would engage in unlawful behavior on October 23, and, in fact, they did not.[6] Yet the statute applies regardless of the propensity of the group for illegal behavior.[7] This blunderbuss approach, which encompasses so many lawful demonstrators, cannot be considered "narrowly tailored." *See McIntyre,* 514 U.S. at 350–51, 115 S.Ct. 1511 ("Although these ancillary benefits [of the statute] are assuredly legitimate, we are not persuaded that they justify [the statute's] extremely broad prohibition."); *American Knights of the Ku Klux Klan v. City of Goshen,* 50 F.Supp.2d 835, 842 (N.D.Ind.1999) ("While preventing violence and identifying and apprehending criminals are compelling government interests, the record does not support a connection between the ordinance and Goshen's asserted interests and the ordinance is not narrowly tailored to achieve Goshen's stated goals.").[8] The failure of the statute to comply with this narrowly tailored concept is accentuated by the fact that the government could have taken other less

5. The statute, Penal Law Section 240.35(4), provides in pertinent part:

A person is guilty of loitering when he: ... Being masked or in any manner disguised by unusual or unnatural attire or facial alteration, loiters, remains or congregates in a public place with other persons so masked or disguised, or knowingly permits or aids persons so masked or disguised to congregate in a public place; except that such conduct is not unlawful when it occurs in connection with a masquerade party or like entertainment ...

6. In fact, it was the counter-demonstrators who posed the threat of violence. However, it is well-established that the possibility of provoking a response from onlookers is rarely if ever a justification for quelling speech. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

7. "Anti-mask laws that explicitly permit only certain expressive mask-wearing unnecessari-

ly ban First Amendment exercise, as individuals engaged in political expression do not generally pose the danger that individuals intending to commit crimes do. Therefore, such laws fail the narrowly tailored requirement. Similarly, because individuals who require anonymity in order to speak for lawful reasons do not present the crime risk of those individuals who desire anonymity for unlawful reasons, narrow anti-mask laws overly restrict free speech and also fail the narrowly tailored requirement." Stephen J. Simoni, Note, *Who Goes There?—Proposing a Model Anti–Mask Act,* 61 Fordham L.Rev. 241, 256 (1992).

8. The statute at issue in *American Knights of the Ku Klux Klan v. Goshen* was similar to the one here, but it differed in that it prohibited individuals from wearing masks for the "purpose of disguising or concealing his or her identity" in a "public place." Thus, unlike the statute here, it considered the intent of the wearer and addressed mask-clad individuals rather than groups. *See* 50 F.Supp. at 836.

restrictive measures to address its goals. For example, the police department could ask permit applicants if participants will wear masks and if so, require lead time to insure proper security measures are in place and assign additional officers to curtail any increased risk of disruption by demonstrators or, as happened here, counter-demonstrators.

Second, is there a compelling state interest? While a state has a substantial interest in maintaining law and order, the statute, to pass constitutional muster, must be applicable to the proscribed conduct. Here, the broad exception in the statute excepts masks "in connection with a masquerade party or like entertainment ..." and, therefore, allows everything from masked "trick or treaters" in Queens to the masked participants in the annual Gay Pride parade on Fifth Avenue. Defendants do not suggest that one masked event is less likely to lead to criminal behavior than another since illegal activity can occur anywhere people gather and the statute makes no distinctions. Surely, if masked events posed such a significant problem for the police department, the exception would not have found its way into the statute. In fact, the determination of whether any particular event presents a risk of disruption must be made on an individualized, case-by-case basis in which the police consider the various factors. *See Chicago v. Mosley*, 408 U.S. 92, 100–01, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications"). Here, the police could have adequately prepared for the event, it had ample notice and the event was held on a Saturday, next door to police headquarters.

In short, if there is a state interest, it fails to satisfy the standard required to justify an infringement on political speech. Thus, while the defendants are, of course, mandated to enforce laws punishing disorderly and criminal behavior directly, the First Amendment vitiates the jurisdiction of the anti-mask statute as a means of doing so indirectly. *See McIntyre*, 514 U.S. at 357, 115 S.Ct. 1511.

### III. Wearing Masks is Protected by the Right to Symbolic Speech

Plaintiff contends that the statute is unconstitutional as a violation of its First Amendment protection of symbolic speech. Specifically, the plaintiff contends that the wearing of the hooded mask constitutes symbolic speech that is protected under the First Amendment.

It is well-established that certain "non-speech" conduct can constitute protected, symbolic speech. *See Tinker v. Des Moines Community Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (holding that a student had the right to wear a black arm band to school to protest the Vietnam War). While it is true that just because a person intends to express an idea through conduct does not mean that the conduct is necessarily protected, *see United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), "conduct" may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

The Court in *Texas v. Johnson* set forth the standard that applies here. In that case, the Court held that the plaintiff's act of burning the American flag in protest was protected under the First Amendment as expressive conduct, despite the state's interests in preserving the peace or pre-

serving the flag as a symbol of national unity. The Court began its analysis by considering whether the plaintiff's conduct constituted "expressive conduct." To make this determination, the Court held that it must find that "[a]n intent to convey a particularized message was present, and [that] the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533. After concluding that the plaintiff satisfied this element, the Court continued to consider "whether the State's regulation is related to the suppression of free expression." *Id.* at 403, 109 S.Ct. 2533. In other words, whether the legislature intended to dampen speech when it crafted the statute. The Court noted that if it found that there was no intent to suppress a particular form of speech, then it must apply the less stringent standard set forth in *O'Brien* to determine whether the statute survived.[9] If, on the other hand, it found that the suppression of speech was the purpose, then it must apply a more demanding standard. *Id.* at 403, 109 S.Ct. 2533. In that case, the Court found that the *O'Brien* test was inapplicable as the statute *was* intended to limit speech, and, therefore, it applied strict scrutiny and found that the statute did not pass constitutional muster.

Applying this test here, clearly the masks constitute expressive conduct. The regalia of the American Knights is readily identifiable and is intended to and does convey a message that most people are likely to understand. *See e.g., Id.* at 404, 109 S.Ct. 2533. The hooded masks are an integral part of the message that links the American Knights to the KKK and its horrific ideology. The defendants attempt to defuse the message of the hooded masks by separating out the masks from the rest of the regalia and arguing that the masks themselves do not convey a particularized message. This argument runs counter to prevailing precedent. In *Hurley v. Irish–American Gay Group of Boston*, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), we read, "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.* (citing examples of expressive conduct including saluting the flag—and refusing to do so—wearing an armband, displaying a red flag, and even marching, walking or parading in uniforms displaying the swastika) (citations omitted). Undoubtably the masks with the hoods, taken together, deliver the message that the American Knights intends to convey.

 Having found that wearing the masks does constitute "expression" under the First Amendment, let us consider

---

9. The Court in *O'Brien* established the test for determining whether a government regulation should survive a claim that it infringes on the right to symbolic speech when the regulation is not alleged to have been enacted for the purpose of quelling speech. There, the Court considered the constitutionality of a statute that made it illegal to destroy or otherwise mutilate a selective service registration card, or draft card. The plaintiff had been arrested for burning his draft card and challenged the conviction on the ground that the statute was an unconstitutional infringement on his right to freedom of expression. However, the Court rejected his challenge, after applying the following test:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest. *Id.* at 377, 88 S.Ct. 1673.

whether the statute was intended to suppress or popularize any particular viewpoint. This issue is relatively simple as neither side contends that this statute was enacted with an illicit motive.[10] Thus, the *O'Brien* test is in order. *See United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The test has four components:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673.

I have already concluded that the statute fails prong two—the important or substantial government interest—and prong four—narrowly tailored.[11] *See* infra section II (describing in more detail). As the statute does not survive even the less stringent *O'Brien* test, I find that it violates the right of plaintiff's members to express themselves through symbolic speech.[12]

## IV. Penal Law § 240.35(4) is Facially Unconstitutional

■ Plaintiff further contends that § 240.35(4) is facially unconstitutional as it impermissibly distinguishes on its face between gatherings "in connection with a masquerade party or like entertainment" and all other types of gatherings.

■ A government entity undoubtedly has the right to place reasonable time, place, or manner restrictions on speech in order to achieve legitimate objectives. *See Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661, (1989) (noise regulation); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (anti-noise provision); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (licensing requirement for parades). However, "a constitutionally permissible time, place or manner restriction may not be based upon either the content or subject matter of speech." *Con. Edison Co. of New York v. Public Serv. Comm. of New York,* 447 U.S. 530, 536, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

In *Con. Edison,* the plaintiff sued the Public Services Commission of New York

---

**10.** The statute was enacted in 1965 but its substance can be traced back to legislation originally enacted in 1845 as a part of the Anti–Rent Riot act. That Act was enacted specifically to thwart armed insurrections by Hudson Valley farmers who used disguises to attack law enforcement officers. *See* Haroules Aff. Ex. K., *Messages from the Governors of the State of New York Comprising Executive Communications to the Legislature and Other Papers Relating to Legislation from the Organization of the First Colonial Assembly in 1683 to and Including the Year 1906,* Vol. IV, 1843–1856, pp. 139–150.

**11.** *O'Brien* is further distinguishable from our facts, as the Court noted there that its holding did "not foreclose consideration of First Amendment claims in those rare instances

when an 'incidental' restriction upon expression ... in practice has the effect of entirely preventing a speaker from reaching a significant audience with whom he could not otherwise lawfully communicate." *See O'Brien,* 391 U.S. at 389, 88 S.Ct. 1673 (Harlan, concurring).

**12.** The police department's denial of a permit on the grounds that a proposed event would violate the anti-mask statute may also constitute a prior restraint on speech. *See Bantam Books v. Sullivan,* 372 U.S. 58, 70–71, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). This lends even further support to the application of a higher standard of review in scrutinizing the statute, a test it undoubtably fails. *See Collin v. Smith,* 578 F.2d 1197, 1209 (7th Cir.1978).

on the ground that the Commission's regulation prohibiting "utilities from using bill inserts to discuss political matters, including the desirability of future development of nuclear power" violated its First Amendment rights. The Commission argued that the regulation allowed the consumer access to "useful" information and only halted the dissemination of controversial political information. The Commission also emphasized that the ban did not favor any particular political viewpoint.

The Court explained the distinction between a content-neutral restriction on speech and a content-based one and the different levels of scrutiny for each. With regards to a content-neutral restriction on speech, the Court wrote, "A restriction that regulates only the time, place, or manner of speech may be imposed so long as it is reasonable." Thus the Court indicated that a low level of scrutiny was appropriate. However, with regards to the content-based speech, the Court explained that a higher level of scrutiny was required. "[W]hen [the] regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not become prohibited 'merely because public officials disapprove the speaker's views.'" *Id.* at 536, 100 S.Ct. 2326 (citation omitted). The Court continued to emphasize that, "[a]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.* at 537, 100 S.Ct. 2326 (citation omitted). Applying this criteria, the Court found the regulation unconstitutional, observing that "[t]o allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Id.* at 538, 100 S.Ct. 2326.

■ Defendants argue that *Con Edison* is inapposite here, because in that case the ban expressly forbid controversial, political topics, while here, the language of the statute does not mention political speech. In a similar vein, defendants suggest that evidence of a legislative intent to inhibit a particular type of speech is a prerequisite to finding a First Amendment violation and point out that here there is no evidence of such an intention. In support of their claim, defendants cite *Turner Broadcasting System, Inc. v. FCC,* in which the Court stated that the "primary inquiry" in determining whether a statute is content-neutral is whether there is evidence of an illicit legislative purpose. *See Turner Broad. Sys. Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Defendants, however, neglect to recognize the caveat that immediately follows: "But while content-based purpose may be sufficient in certain circumstances to show that a regulation is content-based, it is not necessary to such a showing in all cases." *Id.* Here, illicit legislative intent is not a necessary ingredient to a violation of the First Amendment. Like the regulation in *Con Edison* (and unlike the statute in *Turner*), N.Y. Penal Law § 240.35(4) distinguishes on its face between types of expression—it allows masks for entertainment events but for no others. The result is that a face mask worn to delight the public is lawful while one intended to sway its political beliefs is unlawful. The legislature's intent may or may not reflect a yen to be entertained and to inhibit political speech (hard as this is to believe), but the lack of an illicit intent does not negate the clear preference for one type of speech over others.[13]

---

13. *See generally Tunick v. Safir,* 209 F.3d 67, 84 (2d Cir.2000) (stating that "grave questions would . . . arise as to the rationality of a law that singled out for prohibition one form

Defendants' argument that the statute's omission of the words "political" or "controversial" speech somehow exempts it from First Amendment scrutiny is similarly unconvincing.

As this statute is clearly founded on the content of the speech, it cannot be sustained as a time, place or manner restriction. *See Con. Edison*, 447 U.S. at 537, 100 S.Ct. 2326 (holding that as the regulation was indisputably based on the content of the bill inserts, that it could not be found to be a constitutional time, place or manner restriction).

## V. Selective Enforcement of the Statute

 Finally, plaintiff challenges the statute on the ground that the defendants have engaged in viewpoint discrimination by allowing certain groups to take part in masked demonstrations whose message it favors.

 "Viewpoint discrimination is ... an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *See Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

In support of its claim, plaintiff cites several high-profile non-entertainment gatherings in which the police department allowed the participants to cover their faces by wearing a mask or the equivalent. These include Iranian students protesting the Shah in 1977, protesters rallying after the funeral of Amadou Diallo in 1999, protesters opposing the rally held by the

plaintiff in this action on October 23, 1999 who wore rubber face masks satirizing Mayor Giuliani, and pro-Palestinian protestors who wore kefiyahs or head scarves on October 13, 2000 when they gathered at Times Square and again on October 20, 2000 when they assembled at the Israeli Consulate.

In response, defendants argue that allowing these groups to gather does not amount to selective enforcement because in those cases the participants did not provide advance warning of their intent to demonstrate and wear masks, and that the police department used its discretion to determine that Penal Law § 240.35(4) should not be enforced. It stretches credulity to understand how the fact that the police department was not given advance warning of a group's intention to wear masks prevented enforcement of the law while with advance warning, a proper parade permit application, and the time for the police to prepare an application may and will be rejected. As the defendants have offered no reasonable explanation of this somewhat skewed interpretation of the statute, it seems indisputable that the city has engaged in viewpoint discrimination by selectively applying the statute to the American Knights while not to other similarly situated groups.

In finding Penal Law § 240.35 unconstitutional, a decision that effectively permits the American Knights to wear masks, I am mindful of the delicate climate that pervades the city and the rest of the country today. Recent events have brought us to an elemental crossroads where civil liberties are embattled against our concerns for national security. While clearly a commitment to constitutional principles must not be a "suicide pact," [14] the rational and mea-

---

of nude expression that is concededly covered by the First Amendment, while permitting,

with mighty little explanation, many other equally nude demonstrations").

**14.** This concern was eloquently expressed by

sured exercise of jurisprudence must be zealously sustained even in time of war, including the war on terrorism. The conflict between civil liberties and security in times of national crises is nothing new, and at times have resulted in moments not our proudest, including the Alien and Sedition Acts of 1798, President Lincoln's suspension of habeas corpus, the Espionage Act prosecutions of anti-war statements during World War I, the internment of American citizens of Japanese descent during World War II, and the Cold War Communist scare of the McCarthy era. This concept was eloquently underscored by Justice Brennan some 15 years ago in these words:

> The struggle to establish civil liberties against the backdrop of these security threats, while difficult, promises to build bulwarks of liberty that can endure the fears and frenzy of sudden danger— bulwarks to help guarantee that a nation fighting for its survival does not sacrifice those national values that make the fight worthwhile.... For in this crucible of danger lies the opportunity to forge a worldwide jurisprudence of civil liberties that can withstand the turbulences of war and crisis. In this way, adversity may yet be the handmaiden of liberty.

William J. Brennan, Jr., *The Quest to Develop a Jurisprudence of Civil Liberties in Times of Security Crises*, Speech at the Law School of Hebrew University, Jerusalem, Israel (Dec. 22, 1987) (as published by the Brennan Center for Justice at NYU School of Law).

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED and defendants' motion is DENIED. The Clerk of Court is instructed to close this case and remove it from my docket. **SO ORDERED.**

---

Justice Arthur Goldberg, writing for the Supreme Court in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 160, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), who commented that "while the Constitution protects against invasions of individual rights, it is not a suicide pact." In writing, Justice Goldberg echoed a similar concern earlier formulated by Justice Robert H. Jackson dissenting in *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949):

> This Court has gone far toward accepting the doctrine that civil liberty means the removal of all restraints from these crowds and that all local attempts to maintain order are impairments of the liberty of the citizen. The choice is not between order and liberty. It is between liberty with order and anarchy without either. There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.

*Terminiello*, 337 U.S. at 37, 69 S.Ct. 894 (J. Jackson, dissenting).