356 F.3d 197
 CHURCH OF the AMERICAN KNIGHTS OF THE KU KLUX KLAN, Reverend Jeffrey L. Berry, Reverend James W. Sheeley, and Jane Doe and Richard Roe, Jane Doe and Richard Roe being members of the American Knights, Plaintiffs-Appellees,
v.
Bernard KERIK, Commissioner of the Police Department of the City of New York, and The City of New York, Defendants-Appellants.
 No. 02-9418.
 United States Court of Appeals, Second Circuit.
 Argued: August 4, 2003.
 Decided: January 20, 2004.
 
 Appeal from the United States District Court for the Southern District of New York, Harold Baer, Jr., J. COPYRIGHT MATERIAL OMITTED Ronald E. Sternberg (Leonard Koerner, Rachel Goldman, of counsel; Michael A. Cardozo, Corporation Counsel of the City of New York, on the brief), Office of the Corporation Counsel of the City of New York, New York, NY, for Appellants.
 Beth Haroules (Arthur N. Eisenberg, Norman Siegel, of counsel), New York Civil Liberties Union Foundation, New York, NY, for Appellees.
 Before: JACOBS, CABRANES, and SOTOMAYOR, Circuit Judges.*
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 Defendants, the City of New York and its Police Commissioner,[1] appeal from a grant of summary judgment to plaintiffs, the Church of the American Knights of the Ku Klux Klan, the Reverend Jeffrey L. Berry, the Reverend James W. Sheeley, and Jane Doe and Richard Roe (collectively, "American Knights") entered by the United States District Court for the Southern District of New York (Harold Baer, Jr., Judge), dated November 19, 2002. The District Court found New York's anti-mask statute, New York Penal Law § 240.35(4), invalid under the First Amendment. Church of the American Knights of the Ku Klux Klan v. Kerik, 232 F.Supp.2d 205, 220 (S.D.N.Y.2002). For the reasons stated below, we reverse.
 
 Background
 
 2
 The American Knights claims to be an "unincorporated political membership association that advocates on behalf of the white race and the Christian faith." Id. at 208. The organization was founded in 1994 by plaintiff Jeffrey Berry, currently the group's Imperial Wizard or national leader. While not formally associated with other organizations bearing the name "Ku Klux Klan," or a facsimile thereof, the American Knights does "identify in part with the Ku Klux Klan which existed earlier in American history insofar as both groups believe in racial separation and in the importance of the Ten Commandments and the virtues of religious belief."[2] The group "opposes integration, affirmative action, racial intermarriage, immigration and abortion." As plaintiff Berry stated in his deposition, members follow the "old tradition of the hood and robe," the garb traditionally associated with the Klan of the Reconstruction era and its early twentieth-century purported successor.
 
 
 3
 On September 24, 1999, the American Knights applied to the New York Police Department ("police department") for a parade permit and a sound device permit for an event to be held on Saturday, October 23, 1999, on the steps of the New York County Courthouse at 60 Centre Street. Id. at 207. After reviewing the application, the police department notified the American Knights on October 15, 1999 that its plan to wear masks would violate New York Penal Law § 240.35(4), New York's anti-mask law. Id. That statute provides, in pertinent part:
 
 
 4
 A person is guilty of loitering when he: Being masked or in any manner disguised by unusual or unnatural attire or facial alteration, loiters, remains or congregates in a public place with other persons so masked or disguised, or knowingly permits or aids persons so masked or disguised to congregate in a public place; except that such conduct is not unlawful when it occurs in connection with a masquerade party or like entertainment ....
 
 
 5
 N.Y. Penal Law § 240.35(4) (McKinney 2000). The permit was therefore denied. Church of Am. Knights, 232 F.Supp.2d at 207.
 
 
 6
 On October 19, 1999, the American Knights sought a preliminary injunction to force the police department to allow its members to demonstrate while wearing masks. Id. at 208. On October 21, a hearing was held before an anomalous "panel" of the District Court, consisting of Judge Harold Baer, Jr. and Judge Alvin K. Hellerstein; the latter had been assigned a related case dealing with the logistics of the planned event. Id. at 207. Judge Baer issued a preliminary injunction that allowed the American Knights to conduct the event with masks. Id. at 208. The following day, a panel of this Court (Kearse, Miner and Cabranes, JJ.) stayed that part of the District Court's order permitting the use of masks. Safir v. Church of the American KKK, No. 99-9242 (2d Cir. Oct. 22, 1999).[3] The American Knights applied pursuant to 28 U.S.C. § 1651 to Justice Ginsburg, our Circuit Justice, to reinstate the preliminary injunction, and on October 23, 1999 she declined to do so. Church of Am. Knights, 232 F.Supp.2d at 208; see generally John Kifner, Unmasked Klan Is Besieged at Manhattan Rally, N.Y. Times, Oct. 24, 1999, at A1. Our stay effectively negated the District Court's order permitting the American Knights to demonstrate with masks.
 
 
 7
 The American Knights conducted its demonstration on October 23, 1999 as planned. Church of Am. Knights, 232 F.Supp.2d at 208. Seventeen members participated and wore the American Knights' regalia, including robes and hoods, but did not wear masks. Id. In proceedings before the District Court after the demonstration, both parties moved for summary judgment on the American Knights' request for declaratory relief and a permanent injunction. Id. The District Court granted plaintiffs' motion for summary judgment, and denied defendants' motion for summary judgment, on four independent and alternative First Amendment grounds. See id. at 210-20.
 
 
 8
 First, the District Court held that the American Knights' mask wearing was protected by the right to anonymous speech. Id. at 210. The Court relied primarily on three Supreme Court decisions: NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which held that the State of Alabama could not compel the National Association for the Advancement of Colored People to reveal to the State's Attorney General lists of its members' names and addresses; Buckley v. Valeo, 424 U.S. 1, 72-74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), which upheld a federal statute requiring the disclosure of donors to political parties, but noted circumstances in which the statute might be unconstitutionally applied; and McIntyre v. Ohio Elections Commission, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), which invalidated an Ohio statute that prohibited the distribution of anonymous campaign literature. The District Court reasoned that, "[l]ike the NAACP members, the citizen distributing leaflets and the donors to political campaigns, the American Knights have produced unrefuted evidence that it has a legitimate fear of reprisal if its members reveal their identities at public American Knights' events." 232 F.Supp.2d at 213. The Court rejected defendants' attempts to distinguish these precedents as involving "compelled disclosure" rather than "prevented concealment," and held that since the statute restricts protected speech, the inquiry is whether the statute is narrowly tailored to serve a compelling state interest. Id.
 
 
 9
 The District Court concluded that the statute did not pass the exacting scrutiny prescribed in the anonymous speech cases. Id. at 215. It agreed with defendants that the statute advanced security and law enforcement concerns: "The statute prevents groups of demonstrators from concealing their faces which understandably makes it more difficult for police officers to identify and apprehend wrongdoers." Id. at 214. However, the District Court held that the statute was not narrowly tailored to these concerns because it applied regardless of the demonstrators' propensity for illegal behavior. Id. The Court determined that the government could have taken other, less restrictive means to address its goals; "[f]or example, the police department could ask permit applicants if participants will wear masks and if so, require lead time to insure proper security measures are in place and assign additional officers to curtail any increased risk of disruption by demonstrators or, as happened here, counter-demonstrators." Id. at 215. The Court also questioned whether the defendants' asserted interest in law enforcement was a compelling one, in light of the statute's exception for entertainment events, where crime might just as easily occur. Id.
 
 
 10
 Second, the District Court found that wearing masks was protected as expressive conduct or symbolic speech. Id. at 216. The Court determined, as an initial matter, that wearing the masks constituted expressive conduct, in that "[t]he hooded masks are an integral part of the message that links the American Knights to the KKK and its horrific ideology." Id. The Court thereby rejected defendants' argument that the masks themselves, as distinct from the rest of the Klan regalia, did not convey a particularized message, explaining that "`a narrow, succinctly articulable message is not a condition of constitutional protection ....'" Id. (quoting Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995)). The Court then determined that, since neither party argued that the statute was enacted with a motive to suppress or popularize any particular viewpoint, the applicable level of scrutiny was that set forth in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See Church of Am. Knights, 232 F.Supp.2d at 217. Under O'Brien, a statute will be upheld if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest unrelated to the suppression of free expression; and if the incidental restriction on speech is no greater than is essential to the furtherance of that interest. See O'Brien, 391 U.S. at 377, 88 S.Ct. 1673. The District Court concluded, referring to its prior discussion of the right to anonymous speech, that the anti-mask statute was not narrowly tailored to serve an important or substantial government interest. Church of Am. Knights, 232 F.Supp.2d at 217.
 
 
 11
 Third, the District Court held that the anti-mask statute was facially invalid, since it "distinguishes on its face between types of expression — it allows masks for entertainment events but for no others." Id. at 218. The Court reasoned that the "result is that a face mask worn to delight the public is lawful while one intended to sway its political beliefs is unlawful." Id. The Court concluded, "[a]s this statute is clearly founded on the content of the speech, it cannot be sustained as a time, place or manner restriction." Id. at 219.
 
 
 12
 Fourth and finally, the District Court held that the City "engaged in viewpoint discrimination by selectively applying the statute to the American Knights while not to other similarly situated groups." Id. The Court seemed to undertake a "viewpoint discrimination" inquiry under the First Amendment, but in places characterized its analysis in terms of "selective enforcement," a phrase from Equal Protection jurisprudence. The Court pointed to other high-profile, non-entertainment gatherings in which the police department did not arrest participants who covered their faces, and the Court rejected defendants' argument that there was no viewpoint discrimination because, in those cases, the participants did not provide advance warning to the police department of their intent to wear masks. Id.
 
 
 13
 On appeal, defendants argue that (1) the masks worn by the American Knights do not possess sufficient communicative elements to implicate the First Amendment; (2) even if mask wearing constituted expressive conduct, the anti-mask statute is constitutionally valid as either a permissible restriction on symbolic expression or as a reasonable time, place or manner restriction; (3) the First Amendment does not extend to protect masked expression in a public forum; (4) even if the First Amendment did so extend, the statute is narrowly tailored to serve an overriding state interest, and is therefore constitutionally valid; and (5) the American Knights was not the victim of unconstitutional viewpoint discrimination or selective enforcement.
 
 Discussion
 
 14
 We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmoving party. See, e.g., New York State Ass'n of Realtors, Inc. v. Shaffer, 27 F.3d 834, 838 (2d Cir.1994).
 
 I. New York's Anti-Mask Law
 
 15
 New York's anti-mask law, reenacted in its current form in 1965, can be traced back in substance to legislation enacted in 1845 to thwart armed insurrections by Hudson Valley tenant farmers who used disguises to attack law enforcement officers. See Church of Am. Knights, 232 F.Supp.2d at 217 n. 10. The "Anti-Rent era" in New York history, running from 1839 to 1865, involved a conflict over lease terms between the landlords and tenants of vast manorial estates. See generally Charles W. McCurdy, The Anti-Rent Era in New York Law and Politics, 1839-1865 ("McCurdy") (2001); Reeve Huston, Land and Freedom: Rural Society, Popular Protest, and Party Politics in Antebellum New York ("Huston") (2000). The tenants held "leases in fee," an arrangement in which they paid the landlord rent, and rendered annual services, for an indefinite term. "Quarter sale" provisions in the leases commonly entitled landlords to one-fourth of the sale price if the tenants sold their farms. McCurdy 1. Depressions in the prices of wheat and loss of soil productivity left many tenants unable to fulfill their rental obligations, and ultimately indebted for back rent. Huston 47-49; McCurdy 12-13. After the death in 1839 of Stephen Van Rensselaer III, the "Good Patroon" of Rensselaerwyck,[4] the largest estate in New York, his son Stephen Van Rensselaer IV demanded repayment of outstanding debts, and sought to evict tenants who did not pay. Huston 85-92; McCurdy 15-18. Their livelihood threatened, tenants organized anti-rent associations to muster funds for litigation and to exert pressure on legislators. Huston 97, 107-08. Some anti-renters formed bands of so-called "Indians," disguised in calico gowns and leather masks, who forcibly thwarted landlords' efforts to serve farmers with process or to conduct distress sales. Id. 116-19. The operations of the masked Indians commonly involved intimidation, and sometimes tarring and feathering, but also caused three deaths from 1844-45, including the death of a sheriff. Id. 120, 146-150.
 
 
 16
 In response to the civil unrest in upstate New York, the New York legislature passed on January 28, 1845 "An Act to prevent persons appearing disguised and armed." Laws of the State on New York, 68th sess., at 5-7 (C. Van Benthuysen & Co. 1845). It authorized the pursuit and arrest of any person who "having his face painted, discolored, covered or concealed, or being otherwise disguised, in a manner calculated to prevent him from being identified, shall appear in any road or public highway, or in any field, lot, wood or enclosure." Id. at 5. The Act provided that such a person, upon being brought before a judge "and not giving a good account of himself, shall be deemed a vagrant," and could be imprisoned in the county jail for up to six months. Id. The Act imposed more severe penalties for those who appeared masked in groups: "Every assemblage in public houses, or other places, of three or more persons disguised as aforesaid, is hereby declared to be unlawful," punishable by up to a year's imprisonment. Id. at 6-7. Governor Silas Wright, in a message to the legislature on January 1845, urged the passage of an anti-mask law for the "prevention and punishment of crime." 4 Messages from the Governors 149 (Charles Z. Lincoln ed., J.B. Lyon Co.1909) (1845). Governor Wright explained:
 
 
 17
 [T]he disguises of ... organized bands, calling themselves Indians, are assumed [i.e., worn] for purposes unlawful and highly criminal .... After [an] offense, or other and higher crime has been perpetrated, the disguise is laid aside, and even eye witnesses upon the spot, may not be able to identify the guilty.
 
 
 18
 Id. at 149-50. Governor Wright argued that an anti-mask law "would go far to aid in the prevention of the crimes which have been recently so daringly committed, under the protection of masks and other disguises." Id. at 150.
 
 
 19
 New York's anti-mask law was therefore indisputably aimed at deterring violence and facilitating the apprehension of wrongdoers; the parties agreed, and the District Court properly held, that the statute was not enacted to suppress any particular viewpoint.[5] Church of Am. Knights, 232 F.Supp.2d at 216-17. With the anti-mask law's history as a background, we now turn to the District Court's holding that the act violates the First Amendment rights of the American Knights.
 
 II. Expressive Conduct
 
 20
 It is well established that "[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003). As the Supreme Court has cautioned, however, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled `speech' whenever the person engaging in the conduct intends thereby to express an idea." O'Brien, 391 U.S. at 376, 88 S.Ct. 1673; see also Zalewska v. County of Sullivan, 316 F.3d 314, 319 (2d Cir.2003) (quoting from the preceding passage in O'Brien). In determining whether particular conduct is sufficiently expressive to implicate the First Amendment, therefore, the test is whether "`[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies, Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), and that party must advance more than a mere "plausible contention" that its conduct is expressive. Id.[6]
 
 
 21
 The District Court determined that "[t]he hooded masks are an integral part of the message that links the American Knights to the KKK and its horrific ideology," and concluded that "clearly the masks constitute expressive conduct." Church of Am. Knights, 232 F.Supp.2d at 216. The message conveyed by the masks, according to the District Court, was that the Knights wish to identify with the historic Klan. The American Knights asserts that by wearing masks, its members "intend to convey to the public that [they] follow the ideological tradition of the Klan and share many of the views about racial separation and white pride with which the Klan has been identified."
 
 
 22
 We agree with the District Court that the regalia of the American Knights, including the robe, mask, and hood, are expressive; they are expressive in the way that wearing a uniform is expressive, identifying the wearer with other wearers of the same uniform, and with the ideology or purpose of the group. We do not doubt that a person who viewed a member of the American Knights wearing such regalia would likely grasp that association. New York's anti-mask statute does not, however, bar members of the American Knights from wearing a uniform expressive of their relationship to the Klan. The statute only proscribes mask wearing.
 
 
 23
 The mask that the members of the American Knights seek to wear in public demonstrations does not convey a message independently of the robe and hood. That is, since the robe and hood alone clearly serve to identify the American Knights with the Klan, we conclude that the mask does not communicate any message that the robe and the hood do not.[7] The expressive force of the mask is, therefore, redundant.
 
 
 24
 Not only is the message conveyed by the mask duplicative of the robe and hood, we think the mask adds no expressive force to the message portrayed by the rest of the outfit. The mask's asserted message is already being conveyed unequivocally: Inasmuch as the robe and hood draw an association between the American Knights and the Klan that is clear and unmistakable to any viewer, the addition of the mask cannot make that association any clearer.[8] A witness to a rally where demonstrators were wearing the robes and hoods of the traditional Klan would not somehow be more likely to understand that association if the demonstrators were also wearing masks. The American Knights offers no evidence or argument to the contrary.
 
 
 25
 Additionally, the expressive quality of the mask, as part of the American Knights' regalia, is diminished by the fact that mask wearing appears to be, to some extent, optional among American Knights.[9] Plaintiffs Jeffrey Berry and James Sheeley, respectively the National Imperial Wizard and the Grand Dragon for the Realm of New York and New Jersey of the American Knights, attend rallies without wearing masks. One rank-and-file member testified that some attendees at rallies, including members who are not part of the hierarchy, do not wear masks. These are "people who are already public" and who do not need to wear masks to protect their identities. Plaintiff Berry testified that "[o]nly people who everybody knows who they are already" are permitted to attend rallies without masks. To the extent that mask wearing is not even a uniform practice, the masks scarcely contribute to the expressiveness of the American Knights' uniform.
 
 
 26
 The approach we take today, analyzing the expressive value of the mask apart from the robe and hood, is supported by our decision in Latino Officers Association, New York, Inc. v. City of New York, 196 F.3d 458 (2d Cir.1999). In that case, we held that the New York Police Department's parade policy likely ran afoul of the First Amendment by preventing the plaintiffs, the Latino Officers Association ("LOA"), from marching in parades while wearing their police uniforms to protest discrimination and misconduct within the police force. Id. at 469. The City of New York argued that the plaintiffs' interest in wearing police uniforms was not protected under the First Amendment at all, because members of the public were unlikely to understand the plaintiffs' message merely from the fact that they were wearing uniforms. Id. at 465. In rejecting the City's argument, we explained that "members of the public — specifically, the spectators at each of the parades — are more likely to discern and understand the LOA's message about discrimination and misconduct in the NYPD if plaintiffs wear uniforms." Id. at 465-66 (emphasis added). If the LOA's wearing of uniforms had added nothing whatsoever to their message, we would not have found the same First Amendment concerns implicated. See id.; see also Hernandez v. Superintendent, 800 F.Supp. 1344, 1351 (E.D.Va.1992) ("[T]he mask contributes nothing to the message already conveyed by the remainder of the costume, nor does it convey any independent message. Thus, on the facts presented, petitioner's mask-wearing did not constitute expressive conduct entitled to First Amendment protection because it did not convey a particularized message."); Hernandez v. Commonwealth, 12 Va.App. 669, 673, 406 S.E.2d 398, 400 (1991) ("Without the mask, the social and political message conveyed by the uniform of the Ku Klux Klan is the same as it would be with the mask.").
 
 
 27
 We are mindful that a federal court's analysis of the expressive quality of conduct can be a difficult task. It is, however, a task that we must undertake. See, e.g., Zalewska, 316 F.3d at 320 ("Although appellant's activity is expressive, it does not constitute the type of expressive conduct which would allow her to invoke the First Amendment in challenging the county's regulation because the ordinary viewer would glean no particularized message from appellant's wearing of a skirt rather than pants as part of her uniform."). We hold merely that where, as here, a statute banning conduct imposes a burden on the wearing of an element of an expressive uniform, which element has no independent or incremental expressive value, the First Amendment is not implicated, and a balancing of interests under United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), is unnecessary.
 
 III. Anonymous Speech
 
 28
 In numerous decisions, the Supreme Court has recognized a right to anonymous speech grounded in the First Amendment freedoms of speech and association. In the seminal case, NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Court held that the State of Alabama could not compel the NAACP to reveal to the State's Attorney General lists of its members' names and addresses. The Court found that "compelled disclosure" of the NAACP's Alabama membership "is likely to affect adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." Id. at 462-63, 78 S.Ct. 1163. Because the disclosure order was a "substantial restraint" on the NAACP members' constitutionally protected right of association, the Court subjected the order to exacting scrutiny[10] and ultimately invalidated the order. Id. at 463-66, 78 S.Ct. 1163.
 
 
 29
 Subsequent decisions of the Supreme Court have applied NAACP v. Alabama to prevent compelled disclosure of names in other contexts. See generally McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (invalidating an Ohio statute that prohibited the distribution of anonymous campaign literature); Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (invalidating a Los Angeles ordinance that prohibited the distribution of handbills without the names and addresses of persons who prepared, distributed, or sponsored the handbills); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) (upholding the NAACP's refusal to provide the names of its members to municipal tax officials); see also Buckley v. Valeo, 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."). Most recently, the Supreme Court addressed the issue of anonymous speech in Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), where it held that the First Amendment was violated by a Colorado statute that required persons who circulated petitions for an initiative to wear identification badges revealing their names. Id. at 200, 119 S.Ct. 636.
 
 
 30
 These Supreme Court decisions establish that the First Amendment is implicated by government efforts to compel disclosure of names in numerous speech-related settings, whether the names of an organization's members, the names of campaign contributors, the names of producers of political leaflets, or the names of persons who circulate petitions. In contrast, the Supreme Court has never held that freedom of association or the right to engage in anonymous speech entails a right to conceal one's appearance in a public demonstration. Nor has any Circuit found such a right. We decline the American Knights' request to extend the holdings of NAACP v. Alabama and its progeny and to hold that the concealment of one's face while demonstrating is constitutionally protected.
 
 
 31
 The District Court stated that, in determining whether the First Amendment applies, the question is "whether disclosing the identity of the American Knights' members restricts protected speech ...." Church of Am. Knights, 232 F.Supp.2d at 213. Assuming for the discussion that New York's anti-mask law makes some members of the American Knights less willing to participate in rallies, we nonetheless reject the view that the First Amendment is implicated every time a law makes someone — including a member of a politically unpopular group — less willing to exercise his or her free speech rights. While the First Amendment protects the rights of citizens to express their viewpoints, however unpopular, it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against the state's interest in safety, and its right to regulate conduct that it legitimately considers potentially dangerous. Because "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities," a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment. Arcara v. Cloud Books, Inc., 478 U.S. 697, 706, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986).
 
 
 32
 Because we hold that the plaintiffs' right to anonymous speech is not implicated here, we find it unnecessary to consider whether the anti-mask statute passes the scrutiny applied under NAACP v. Alabama and its progeny.
 
 IV. Facial Validity
 
 33
 The Supreme Court has stated that, "[a]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Consol. Edison Co. v. Pub. Serv. Comm'n, 447 U.S. 530, 536-37, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (citation and quotation marks omitted). Applying this rule, the Court held that the New York Public Service Commission's decision to prohibit "utilities from using bill inserts to discuss political matters," id. at 532, 100 S.Ct. 2326, violated the First Amendment rights of the plaintiff utility company. Id. at 544, 100 S.Ct. 2326. Unlike the regulation at issue in Consolidated Edison, New York's anti-mask law regulates conduct — the wearing of masks in groups — rather than pure speech, and is not facially invalid for distinguishing between types of conduct.
 
 
 34
 Further, we have held above that the wearing of masks by members of the American Knights is not expressive conduct that implicates the First Amendment. The anti-mask law, far from restricting expression based on its message, is not restricting protected expression at all.
 
 
 35
 Because the anti-mask law regulates the conduct of mask wearing, and does so in a constitutionally legitimate manner, it can legitimately create an exception for mask wearing that "occurs in connection with a masquerade party or like entertainment." N.Y. Penal Law § 240.35(4). Just as it is not our place to second-guess the New York legislature's determination during the Anti-Rent era that mask wearing by groups poses a threat to the peace, undermining the efforts of law enforcement officers to identify wrongdoers and thus protect the public, so we will not second-guess the apparent legislative determination that mask wearing at entertainment events does not pose the same security risks as mask wearing in other circumstances. We hold that New York's anti-mask law is not facially unconstitutional.
 
 V. Viewpoint Discrimination
 
 36
 The District Court seemingly held that defendants, in applying the anti-mask statute, engaged in "viewpoint discrimination" in violation of the First Amendment rights of the American Knights. Church of Am. Knights, 232 F.Supp.2d at 219-20. The District Court quoted the Supreme Court's statements in Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), that "`viewpoint discrimination is... an egregious form of content discrimination,'" and that "`[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" Church of Am. Knights, 232 F.Supp.2d at 219-20 (quoting Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510). The District Court also held, however, that the statute was not enacted to suppress any particular viewpoint. Id. at 216-17. Because we have held above that the anti-mask law as applied to the American Knights does not burden pure speech or expressive conduct, we see no basis for arguing that the statute burdens the "viewpoint" of the American Knights at all, much less does so in a discriminatory fashion.
 
 
 37
 Although it invoked "viewpoint discrimination" and Rosenberger, a First Amendment case, the District Court's opinion also referred to "selective enforcement," a phrase associated with analysis under the Equal Protection Clause. See Giordano v. City of New York, 274 F.3d 740, 750-51 (2d Cir.2001). A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated. See id. The American Knights argues that the police department denied it a permit on the basis of the American Knights' viewpoint, and points to several instances in which participants in other events covered their faces with masks or the equivalent, and were not arrested. As examples, the American Knights cited:
 
 
 38
 Iranian students protesting the Shah in 1977, protestors rallying after the funeral of Amadou Diallo in 1999, protestors opposing the rally held by the plaintiff in this action on October 23, 1999 who wore rubber face masks satirizing Mayor Giuliani, and pro-Palestinian protestors who wore kefiyahs or head scarves on October 13, 2000 when they gathered at Times Square and again on October 20, 2000 when they assembled at the Israeli Consulate.
 
 
 39
 Church of Am. Knights, 232 F.Supp.2d at 219.
 
 
 40
 Defendants respond that there was no differential treatment — a prerequisite to selective enforcement — because in the situations cited, the participants did not provide advance warning of their intent to wear masks. We agree. The American Knights applied to the New York Police Department for a permit, and specifically informed the police that they would be wearing masks in violation of New York Penal Law § 240.35(4). The police department refused the American Knights a permit. The American Knights has not suggested, much less shown, that any other group was granted a permit in such circumstances. Plaintiffs have therefore failed to establish a case of either viewpoint discrimination or selective enforcement.
 
 Conclusion
 
 41
 For the reasons stated above, we hold that New York Penal Law § 240.35(4) is valid under the First Amendment. The judgment of the District Court is therefore reversed, and the cause remanded to the District Court with instructions to enter summary judgment in favor of defendants.
 
 
 
 Notes:
 
 
 *
 Judge Fred I. Parker was an original member on the panel that heard oral argument on August 4, 2003. He died on August 12, 2003 without having voted on the matter. In accordance with applicable rules and practices of this Court, the Clerk selected, by lot, Judge José A. Cabranes to replace Judge Parker as a member of the panel
 
 
 [1]
 Bernard Kerik was Police Commissioner at the time this lawsuit was commenced. Although the caption continues to bear his name and there has been no formal substitution of parties, the incumbent Commissioner is the effective defendant in this case
 
 
 [2]
 The first Ku Klux Klan was founded in Pulaski, Tennessee, in the winter of 1865 or spring of 1866 as a social clubSee Wyn Craig Wade, The Fiery Cross: The Ku Klux Klan in America ("Wade") 33 (1987), David M. Chalmers, Hooded Americanism: The History of the Ku Klux Klan ("Chalmers") 8 (3d ed.1987); see also Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 1544-46, 155 L.Ed.2d 535 (2003) (discussing the origins of the Ku Klux Klan in upholding Virginia's statute banning cross burning with the intent to intimidate). Mask wearing was part of the Klan's activities from the start, and was first used to create a ghost-like appearance that facilitated Klan members in playing pranks. Wade 33-35. By 1867, however, masked Klan members had assumed the practice of "night riding," making nocturnal visits to the dwellings of blacks in order to harass and intimidate. Id. at 36-37. Over the ensuing years, the Klan established dens throughout the South, reorganized, and mobilized as a vigilante army, directing its activities not only at blacks, but also at white teachers at black schools and other northern "carpetbaggers," and at southern whites who disagreed with the Klan. Id. at 37, 45-46; Black, 123 S.Ct. at 1544. The Klan's nighttime visitations brought with them beatings, rape, arson, and murder. Wade 46-47. In response, Congress in April 1871 passed the so-called "Ku Klux Klan Act," see "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes," 17 Stat. 13 (now codified at 42 U.S.C. §§ 1983, 1985, and 1986), creating a civil rights cause of action in federal court, and authorizing the President to use the military and suspend the writ of habeas corpus to quell civil disturbances under certain circumstances. Black, 123 S.Ct. at 1544. Pursuant to the Ku Klux Klan Act, in October 1871 President Grant employed the U.S. Army's Seventh Cavalry and suspended habeas corpus in parts of South Carolina. Wade 100. By the end of 1871, the first Klan had largely dissolved. Id. at 102; Chalmers 2.
 The second Klan began in 1915, inspired by D.W. Griffith's movie The Birth of a Nation — in turn based on Thomas Dixon's 1905 book The Clansmen — which depicted mask-wearing Klan members protecting the South from blacks and Reconstruction. See generally Wade 119-20, 206; see also Steve Oney, And the Dead Shall Rise: The Murder of Mary Phagan and the Lynching of Leo Frank 605-07 (2003) (discussing the relationship between the founding of the second Ku Klux Klan and the infamous lynching of Leo Frank, a Brooklyn-raised Jew who had been convicted of murdering Mary Phagan, a worker at an Atlanta pencil factory in which Frank was superintendent). The second Klan declared its adversaries to include (in addition to blacks) Jews and Catholics; and resumed intimidation, whippings, and murders. In the 1920s, the Klan had successes in electing public officials — including the governor and both U.S. Senators from Indiana — and organized a well-publicized March on Washington, D.C. in August 1925. Id. at 215, 249. Klan membership had begun to wane after 1924, however, and the Klan suffered a long decline before ultimately disbanding in 1944 to avoid income tax liability. Id. at 253, 275; Chalmers 424. The Klan was revived after the Second World War, but beginning in 1949 became badly splintered, and has persisted as a number of independent groups. Chalmers 6, 424.
 Groups claiming a link to, or an affinity with, earlier Klan organizations have surfaced from time to time in different parts of the country, and have initiated or provoked constitutional litigation, including litigation in this Circuit, related to their intentions to demonstrate publicly. See, e.g., Wilkinson v. Forst, 639 F.Supp. 518 (D.Conn.1986), aff'd in part and rev'd in part, 832 F.2d 1330, 1342 (2d Cir.1987).
 
 
 [3]
 Following extended oral argument on October 22, 1999, we ruled from the bench as follows:
 With respect to the motion of Safir and the City of New York for a stay, we are mindful that this case raises difficult questions of law, and perhaps questions not as simple as sometimes portrayed. We are mindful of the finding of the District Court that the restrictions sought to be imposed by the city are not content based.
 We conclude that that finding is not clearly erroneous or an abuse of the District Court's discretion. In light of that finding we conclude that this case is distinguishable from those cases in which the Supreme Court has protected the anonymity of organizations and individuals seeking to exercise First Amendment rights of association and speech. Accordingly, we have concluded that[,] in the circumstances here presented, a stay of the judgment of the District Court, which judgment requires the issuance of a permit to the plaintiffs despite the plaintiffs' use of masks, is appropriate. The judgment of the District Court is stayed to the extent that it requires the city to issue a permit to the plaintiffs that allows the use of masks. It is so ordered.
 Additionally, we denied the motion of a group of Klan opponents, the Partisan Defense Committee, for an injunction granting them a sound permit for a rally at the same site as the American Knights. See generally Benjamin Weiser, Appeals Court Bars Klan Masks; Group Still Plans to Stage Rally, N.Y. Times, Oct. 23, 1999, at A1.
 
 
 [4]
 "Patroon," as readers familiar with the history of New York State will know, is a Dutch word referring to a landholder in the colony of New Netherland, granted proprietary rights to an estate or "patroonship" in exchange for bringing settlers to the colonySee, e.g., Edwin G. Burrows & Mike Wallace, Gotham: A History of New York City to 1898, at 28 (1999).
 
 
 [5]
 The District Court did hold, however, that the statute had been applied by defendants in such a way as to discriminate unconstitutionally against the American Knights' viewpointSee Church of Am. Knights, 232 F.Supp.2d at 219.
 
 
 [6]
 The Supreme Court's decision inHurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), did not alter these standards. In Hurley, the Court, in finding the St. Patrick's Day Parade in Boston to be an "expressive parade," stated that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a `particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." Id. at 569, 115 S.Ct. 2338 (citation omitted). While we are mindful of Hurley's caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted Hurley to leave intact the Supreme Court's test for expressive conduct in Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). See Zalewska v. County of Sullivan, 316 F.3d 314, 319 (2d Cir.2003) ("To be sufficiently imbued with communicative elements, an activity need not necessarily embody `a narrow, succinctly articulable message,' but the reviewing court must find, at the very least, an intent to convey a `particularized message' along with a great likelihood that the message will be understood by those viewing it.") (citations omitted).
 
 
 [7]
 We note that before the District Court, the Knights claimed that the masks conveyed — beyond the messages of tradition and identity with the Klan conveyed by the robe and hood — additional and independent messages, both secular and religious, including equality among the members and humility before GodSee Church of Am. Knights, 232 F.Supp.2d at 208. The District Court did not address whether the Knights in fact intended to convey these messages, or whether such messages would likely be understood by onlookers.
 The Knights did not assert in their briefs or at oral argument that the masks convey these messages. The record before us demonstrates that some members of the Knights are not aware of these purported meanings of the masks. See, e.g., Appellants' Br. at 15 (quoting the testimony of a member of the American Knights that wearing the mask and hood "means that a person is a Klansmen," but beyond that, "[t]here's really no message"). This apparent confusion about the mask's message among Klan members is unlikely to be understood by non-Klan members viewing the masks. Indeed, we conclude that some of the assertions by individual American Knights that the masks convey an independent meaning — e.g., "[t]he hooded masks also convey a sense that everyone is equal, regardless of ... race," Church of Am. Knights, 232 F.Supp.2d at 208 — are simply implausible, if not frivolous, and would certainly not be conveyed to a viewer. Accordingly, we agree with the defendants that the masks express nothing beyond the associational ties expressed by the robe and hood.
 
 
 [8]
 The American Knights does not contend that the mask conveys, or is intended to convey, an independent "message" of intimidation, or that it adds an element of fear or intimidation to the message that the rest of Klan regalia conveys. To the extent that such a message of intimidation would be conveyed, it might constitute a "true threat," and would therefore not be protected by the First AmendmentSee Black, 123 S.Ct. at 1548.
 
 
 [9]
 At one point in Klan history, masks were not merely non-mandatory but were evenprohibited. In 1939, Imperial Wizard James A. Colescott publicly condemned floggings and lynchings, and, in recognition of the connection between mask wearing and violence, forbade Klansmen from concealing their faces while wearing their robes. See Wade at 266.
 
 
 [10]
 The Court asked "whether Alabama has demonstrated an interest in obtaining the disclosures it seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association,"NAACP, 357 U.S. at 462-63, 78 S.Ct. 1163, and noted that such a "subordinating interest of the State must be compelling," id. (quotation marks omitted). More recently, in a case likewise involving the right to anonymous speech, the Supreme Court has explained that "[w]hen a law burdens core political speech, we apply `exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).